# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MELISSA LANDA,** | |
| **Plaintiff,** | |
| **v.** | **COMPLAINT and JURY DEMAND** |
| **UNVERSITY OF MARYLAND, COLLEGE PARK,** | **Civil Case No. 1:22-cv- 16** |
| **Defendant.** | |

## <u>COMPLAINT</u>

Plaintiff Melissa Landa, Ph.D., by and through counsel, brings this action for relief against the University of Maryland, College Park (UMD) for violation of Title VII of the Civil Rights Act of 1964 to address unlawful discrimination by UMD. Specifically, Dr. Landa was subjected to a hostile work environment, discrimination, and retaliatory termination, all because she dared to express her religious beliefs, and protested unlawful treatment.

1

## INTRODUCTION

1.      The University of Maryland, College Park ("UMD") is the flagship institution of the University System of Maryland. UMD is the home to more than 40,700 students, 14,000 faculty and staff, and nearly 400,000 alumni.  UMD has stated that it "aspire[s] to become a community that is: United, Respectful, Secure and Safe, Inclusive, Accountable, Empowered, and Open to Growth."[1] The mission of UMD is "to provide excellent teaching, research, and service." The University educates students and advances knowledge in areas of importance to the State, the nation and the world.

2.      For approximately 10 years, from 2007 until 2017, Dr. Melissa Landa worked as a professor at UMD.  In 2015, Dr. Landa's career at the Department of Teaching, Policy and Leadership in the College of Education at UMD was severely crippled and eventually came to an end after the Defendant initiated a series of actions designed to alienate, humiliate, and ultimately terminate Dr. Landa in retaliation for her constitutionally and statutorily protected speech and religious beliefs and affiliations. In 2018, Dr. Landa was officially terminated following a years-long process by Defendant to purge her from their ranks.

---

[1]   "Terrapin Strong," Univ. of Maryland, https://diversity.umd.edu/training-education/terrapinstrong.

## JURISDICTION AND VENUE

3.     This action is authorized pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e to § 2000d-17.

4.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331, 1337 and 1343. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02; and costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. 2000e-5(f) because Defendant reside in this district and/or all of the acts described in this Complaint occurred in this district.

6.     Plaintiff has fulfilled all conditions precedent under Title VII prior to instituting this lawsuit, as necessary, and has otherwise exhausted all of her administrative remedies.

## PLAINTIFF

7.     Plaintiff Melissa Landa, Ph.D., is a private citizen and formerly a non-tenured professor at UMD, a position she held for ten years before being unlawfully terminated. Dr. Landa is Jewish, and celebrates traditional Jewish holidays. Dr. Landa is also a religious Zionist, and her Zionism is a core and fundamental part of her Jewish religious identity.

## DEFENDANT

8.     Defendant University of Maryland, College Park, is organized under the laws of Maryland with its headquarters located at 7999 Regents Dr., College Park, MD, 20742-5235. At all relevant times, the following individuals described herein were agents and/or employees of the Defendant UMD.

9.     John O'Flahavan served as the Plaintiff's Ph.D. advisor from 2003 to 2007.  At all relevant times he served in leadership positions within the College of Education at UMD, including a term as Associate Chair, Department of Teaching and Learning, Policy and Leadership, from 2013-2017.

10.     Jennifer King Rice was at the relevant times Associate Dean of Faculty Affairs at UMD. According to the UMD Office of the Executive Vice Chancellor and Provost, Vice Chancellor Rice was responsible for "academic appointments, promotions and advancements; academic recruitment and retention; faculty grievance proceedings; faculty disciplinary proceedings; faculty housing and loan programs; the Academic Personnel Office; emeriti faculty relations and relations with academic employee organizations and associations." Dr. King now serves as Senior Vice President and Provost at UMD.

11.     Francine Hultgren was at the relevant times Department Chair of the Department of Teaching and Learning, Policy and Leadership at UMD.

## FACTUAL BACKGROUND

12.     Dr. Landa began working at UMD in September 2005 as a Graduate Assistant in the Department of Curriculum and Instruction.

13.     Dr. Landa holds a Ph.D. in English Language Education.

14.     In 2007, Dr. Landa was offered and accepted a full-time faculty position with the Department of Curriculum and Instruction. (After the College of Education underwent reorganization, the Department of Curriculum and Instruction became the Department of Teaching and Learning, Policy and Leadership.)

15.     From 2007 forward, one of the primary roles Dr. Landa filled at the University was that of an Instructor of Record for the undergraduate course of Language Arts Methods, EDCI 342.

16.     In 2013, Dr. Landa was awarded the College of Education's Excellence in Teaching Award. In 2014, she was selected by the University of Maryland Office of Diversity and Inclusion to participate in their Cultural Competence Course Development Project; and, in 2017 she was awarded the College of Education's Exceptional Scholarship Award. In 2017, she received a letter of commendation for her contributions to the Education Abroad Program from Dr. Ross Lewin, the University of Maryland's Associate Vice President for International Affairs.

17.     During the relevant time period, Dr. O'Flahavan was the Associate Chair of the Department. In this role, he was to manage the course schedules and the

graduate assistantships, and to be in charge of the Undergraduate Elementary Education Program, including to be the university liaison with the State of Maryland Department of Education.

18.     During Dr. Landa's employment in the Department, she served as the only Jewish member of the Undergraduate Elementary Educational Instructional Team operating under the direction of Dr. O'Flahavan.

19.     Between 2007 and 2015, Dr. Landa worked with Dr. O'Flahavan on preparing course work and syllabi for EDCI 342, Language Arts Methods, a course which prepared future teachers for language and literacy instruction. Dr. Landa and Dr. O'Flahavan were the instructors of record for EDCI 342 and were responsible for training graduate student teaching assistants to be future instructors for the course. Margaret Peterson was one of the graduate student teaching assistants that Dr. Landa prepared to teach. When Dr. Landa became an instructor of record for EDCI 342, she incorporated content that addressed cultural competence, her area of expertise, into the syllabus – material which had not been previously included in the course.

20.     Until 2015, Dr. Landa and Dr. O'Flahavan enjoyed a close and collegial working relationship.

21.     In December 2015, Dr. Landa began organizing a group of Oberlin College alumni to address antisemitism on college campuses. When Dr. O'Flahavan

was informed by Dr. Landa of this effort, he criticized her efforts, and dismissed the concerns she felt over her non-Jewish friends being unwilling to condemn antisemitism.

22.     In January 2016, Dr. Landa joined many other professors across the United States in becoming an affiliate professor at the University of Haifa – a gesture of solidarity with Israeli scholars who are being ostracized by the academic boycotts against Israel.

23.     Also in January 2016, Dr. Landa informed Dr. Hultgren that she was going to be in the news discussing her work opposing antisemitism, including the Boycott, Divestment and Sanction (BDS) movement – an international campaign that denies the Jewish people their right to national self-determination in their ancestral homeland, Israel. The views held by the BDS movement are qualified as anti-Semitic by the International Holocaust Remembrance Alliance and adopted by the United States Department of Education's Office of Civil Rights. In her public statements, Dr. Landa made clear that her Zionism is part and parcel of her Judaism.

24.     As Dr. Landa's efforts and involvement in raising awareness of antisemitism became more public, the conduct of Dr. Landa's supervisors towards her suddenly and drastically changed for the worse.

25.     On or about February 19, 2016, Dr. Landa raised concerns with Dr. O'Flahavan regarding an Oberlin professor's antisemitic posts online which

included images and posts of Israeli Prime Minister Benjamin Netanyahu depicted as the head of ISIS and blaming the Jewish State for shooting down a Malaysian aircraft.

26.     Dr. O'Flahavan's response was to defend the Oberlin professor's right to say whatever she pleased, and to suggest that Dr. Landa distance herself from the Oberlin group.

27.     During this same time in February and through March 2016, Dr. O'Flahavan began canceling meetings he had scheduled with Dr. Landa to prepare for their upcoming joint presentation at the annual conference of the American Educational Research Association (AERA), scheduled to begin on April 8, 2016.

28.     In March 2016, Dr. Landa joined the Academic Engagement Network ("AEN") which is an organization of American college and university faculty who oppose the BDS movement.

29.     In March 2016, Dr. Landa submitted a request for leave for two weeks to travel to Israel for the Jewish holiday of Passover. She arranged to teach the first week of classes over Skype with her Teaching Assistants physically present in the class, and for a colleague to teach the second week. She provided information regarding her course coverage to Dr. Hultgren, who authorized her request and made no mention of any concern regarding her leave.

30.     The arrangements that Dr. Landa made fulfilled her responsibilities as

stipulated by Provost Mary Ann Rankin.

31.    On or about April 1 2016, Dr. Landa informed Dr. O'Flahavan of her involvement with AEN and her plan to attend the annual AEN conference.

32.    Then, on or about April 7, 2016, Dr. O'Flahavan abruptly informed Dr. Landa that he would not join her in presenting a paper they had co-authored at the upcoming American Educational Research Association (AERA) conference scheduled for April 12, 2016, and that he would not share the podium with Dr. Landa at the conference.

33.    Dr. O'Flahavan's announcement was puzzling since he and Dr. Landa had presented papers together on nine prior occasions.

34.    In the five days leading up to the AERA conference, Dr. Landa hastened to finalize the presentation, and sought assistance from Dr. O'Flahavan. He refused to return many of her requests for information and assistance, and ultimately provided no meaningful help in completing the paper.

35.    Dr. Landa was forced to present at the AERA conference largely without Dr. O'Flahavan's help or cooperation. The experience left her feeling sick.

36.    Toward the end of April 2016, Dr. Landa traveled to Israel for Passover as originally planned and approved by her department.

37.    On April 22, 2016, on the eve of Passover – a Jewish holiday of significant importance to Dr. Landa – Dr. Landa received an unexpected and harsh

email from Dr. Hultgren reprimanding her for taking leave and indicating disapproval of her trip.

38.     Despite the prior approval given by Dr. Hultgren, in her email to Dr. Landa, she suggested that her travel to Israel for Passover possibly grounds for losing her job. Her email noted that it was "quite out of bounds of acceptability with regard to campus policy," and that it put Dr. Landa "in a compromised position" with regard to her responsibilities at the University.

39.     Dr. Hultgren's email, sent right on the eve of the Passover seder, had the obvious and expected effect of ruining Dr. Landa's ability to enjoy and celebrate Passover.

40.     Contrary to Dr. Hultgren's assertion that this type of leave was "out of bounds," Dr. Landa was aware that Dr. Hultgren had previously granted at least one other professor within the Department, Dr. O'Flahavan himself, a two-week absence for vacation in Malaysia in 2012, and to Thailand in 2015.

41.     Upon information and belief, no displeasure or disagreement with Dr. O'Flahavan's two-week leaves was ever expressed by Dr. Hultgren or any other members of the administration at UMD, despite complaints from students to the Provost for Faculty Affairs relating to at least one of his absences.

42.     Upon information and belief, the *only* time such harsh and negative sentiments were expressed by a member of the administration, especially after

advance notice was given and permission received, is when the leave in question was taken for a Jewish holiday.

43.     Despite the Jewish holiday, Dr. Landa attempted to speak with Dr. Hultgren further regarding her confusing communication, but Dr. Hultgren did not respond. When she finally did reach her, Dr. Hultgren suggested that she return immediately. Dr. Landa incurred the additional cost of changing her ticket, the loss of monies spent on an apartment rental, and was unable to spend the holiday in Israel as planned.

44.     Upon her return to campus Dr. Landa met with Dr. Hultgren in person. Dr Hultgren stated that she "should never have granted [Dr. Landa] permission for the trip," and that she had not realized that Passover lasts eight days. In the meeting Dr. Hultgren also accused Dr. Landa of somehow "using" her.

45.     Upon her return to campus, Dr. Landa filed a religious discrimination report with the College Diversity Officer.

46.     While still in Israel, Dr. Landa became aware that she had been awarded a grant from AEN to create a partnership with the Levinsky College of Education in Israel and that two scholars from Levinsky would join her research team.

47.     On or about April 29, 2016, Dr. Landa made Dr. O'Flahavan aware of the grant award and also discussed her desire to involve students at UMD during the next iteration of her Language Arts Methods course (EDCI 364) that she had already

been assigned to teach in Spring 2017.

48.    In response, on or about May 5, 2016, and with no advance warning, Dr. O'Flahavan informed Dr. Landa that she would not be permitted to teach the new version of the literacy course she had taught for more than ten years and would not be permitted to teach a new version of the course in the Spring of 2017 (EDCI 364). In removing her from the course, he effectively made it impossible for Dr. Landa to conduct the necessary research that she needed to under the terms of the grant, putting her entire collaboration with Israel at risk.

49.    Dr. O'Flahavan and Dr. Landa had been working together since 2013 to develop this new course (EDCI 364) to replace the older course Dr. Landa had been teaching for more than a decade (EDCI 342).

50.    The new course (EDCI 364) was to be called "Culturally Responsive Language and Literacy Instruction in Elementary Classrooms" and involved Dr. Landa's particular areas of expertise.

51.    On or about May 20, 2016, in an email to Dr. Hultgren, Dr. O'Flahavan notified Dr. Hultgren of his intention to remove Dr. Landa from teaching the course. He confirmed that while his original plan was for Dr. Landa to teach EDCI 364 in the Spring of 2017, he was now removing her from the course because of "doubts about having [Dr. Landa] teach[] the new course."

52.    Dr. O'Flahavan replaced Dr. Landa – who had more than ten years of

experience – with another faculty member, Margaret Peterson, of only 3 years' experience. Ms. Peterson had minimal experience in elementary education and no expertise in culturally responsive teacher courses.

53.    Dr. O'Flahavan did not have the authority to unilaterally remove Dr. Landa from the course. Still he did so, and only then sought approval.

54.    Upon information and belief, removal of a faculty member from teaching a course (or some iteration of that course) that they had taught over a long period of time was completely unprecedented.

55.    Prior to her involvement in fighting antisemitism, joining AEN, and traveling to Israel to celebrate Passover, Dr. O'Flahavan had always afforded Dr. Landa choices and options regarding her course selection.

56.    Dr. O'Flahavan's action to remove Dr. Landa from teaching this new course effectively prevented Dr. Landa from establishing a partnership with Lewinsky College in Israel.

57.    Dr. O'Flahavan's action also placed Dr. Landa in the position of losing her position in the Undergraduate Elementary Education Program.

58.    In June 2016, Dr. Landa sent an email to Dr. O'Flahavan expressing her concerns regarding the lack of a course to teach in the Program. In response, he assured her that the Department would make sure she was "covered." Instead, Dr. O'Flahavan assigned the remaining courses to doctoral students, violating a

university policy regarding the "pecking order" for course assignments and resulting in student complaints to the Dean and Provost. None of the doctoral students were Jewish.

59.     Subsequently, Dr. Landa made numerous attempts to engage Dr. O'Flahavan and Dr. Hultgren regarding the unprecedented action of removing her as instructor of the course that she had worked for years to develop.

60.     Dr. Landa also repeatedly reminded both Dr. O'Flahavan and Dr. Hultgren of the negative impact of this action, including the interference it would have on her ability to focus on and develop her research. Her pleas fell on deaf ears.

61.     At this time, the Spring 2017 semester scheduled was being finalized and three sections of the new course (EDCI 364) were being made available.

62.     Dr. Landa was the most qualified faculty member to teach this course (due to her ten years of experience and particular areas of developed expertise). Instead of allowing her to teach the course though, Dr. O'Flahavan assigned two sections to himself and one section to Margaret Peterson.

63.     Throughout this process, neither Dr. O'Flahavan nor Dr. Hultgren could provide any valid reason for the decision to remove Dr. Landa from the new course.

64.     When pressed to provide sufficient support for their decision, they provided inconsistent explanations. On one occasion, Dr. O'Flahavan and Dr.

Hultgren claimed that teaching the course would be "too stressful" for Dr. Landa.

65.     On another occasion they falsely and without evidence or detail claimed that it was because she had failed to follow through on professional responsibilities

66.     On another occasion, Dr. O'Flahavan and Dr. Hultgren claimed that Dr. Landa did not have sufficient familiarity with the schools in the area and/or enough contacts with the schools.

67.     On yet another occasion, they asserted that Dr. Landa would not have time to devote to the course because she was mentoring three Teaching Assistants.

68.     For each explanation, Dr. O'Flahavan and Dr. Hultgren failed to provide any evidence to substantiate their claims. Their claims were obviously pretextual and not even coordinated.

69.     In fact, Dr. Landa had ample familiarity with the schools in their area and had worked in the Montgomery County Public School system for 17 years.

70.     In addition, and contrary to their assertion that Dr. Landa lacked experience in teaching "on site" in schools, Dr. Landa had been awarded the College of Education Teaching Award in 2013. The award was based, in part, on a nomination letter from Leslie Gettier, the Elementary Education Program Coordinator, which praised Dr. Landa for her skillful demonstration lessons for mentor teachers and student interns "on site" in elementary schools.

71.     On yet another occasion, Dr. Hultgren claimed that her decision to

support Dr. O'Flahavan's decision to remove Landa from the new course was a result of the growing "conflict" between Dr. Landa and Dr. O'Flahavan. Specifically, Dr. Hultgren indicated that the decision had been made in order to put a "pause" on their working relationship.

72.     Upon information and belief, Dr. Hultgren never acted to scale back Dr. O'Flahavan's professional activities on these same grounds. In other words, only Dr. Landa was being targeted and punished for the alleged "conflict" that she had no part in starting or interest in continuing.

73.     From May to August 2016, Dr. Landa continued to express her concern that her role within the Undergraduate Elementary Education Program was being diminished and that her position within the University was in jeopardy.

74.     On or about August 9, 2016, Dr. Landa contacted the Dean's Office by telephone and expressed concern that she was being discriminated against because of her religion.

75.     On or about August 10, 2016, Dr. Landa submitted written documentation to Donna Wiseman, Dean of the College of Education, outlining the discriminatory treatment she had experienced.

76.     On or about August 12, 2016, Dr. Landa informed Dr. Jennifer Rice, Associate Dean for the College of Education, that she intended to file a Faculty Grievance.

77.     Despite Dr. Landa's reports of religious discrimination, no action was taken by Defendant to address the issue.

78.     On or about August 18, 2016, Dr. Hultgren issued a written decision concerning Dr. Landa's removal from EDCI 342, the Language Arts Methods class. In the letter, Dr. Hultgren informed Dr. Landa that EDCI 342 was not being offered in the modified Undergraduate Elementary Education Program and that the course was not going to be replaced, but instead the course's objectives were to be reframed, and distributed throughout a new, four-course line up of literary courses.

79.     Also in this August 18 email, Dr. Hultgren noted that Dr. Landa would be qualified to teach any one of these four courses, despite previously (and pretextually) suggesting that she lacked the requisite qualifications to teach the course.

80.     On October 6, 2016, Dr. Landa contacted the UMD Ombuds Officer, Ellin Skolnick to report the religious discrimination. On October 13, 2016, Dr Landa submitted her grievance outlining the religious discrimination to the Department's Diversity Officer, Ebony Terrell Shockley.

81.     In the meantime, Dr. Landa continued to work to contribute within the Program and explore other options with Dr. O'Flahavan that would allow her to maintain her role.

82.     Dr. Landa requested to teach another course, EDCI 397, to replace the

course she had been removed from; Dr. O'Flahavan initially responded and promised to inquire, but never responded again to Dr. Landa's request.

83.    Dr. Landa also made other suggestions for staying involved and making up for the course she had been removed from, but Dr. O'Flahavan responded by chastising Dr. Landa and indicated that he was "at the end of [his] rope on this."

84.    Dr. Landa also made requests to teach one of several available literacy courses in the Department, including EDCI 262 and EDCI 488R. Both requests were not acknowledged by Dr. O'Flahavan and he instead assigned these courses to Doctoral students (all members of non-Jewish faiths)- despite their lack of professional qualifications, experience, or prior mentoring by a faculty member.

85.    UMD subsequently received numerous complaints from undergraduate students regarding the Doctoral students' teaching of both of these courses, EDCI 262 and 488R.

86.    In October 2016, Dr. Landa became aware that one of the three new sections of the course (EDCI 364) remained unstaffed, despite prior representations by Dr. Hultgren and Dr. O'Flahavan that staffing assignments were complete, and requested to be assigned to the course. Dr. Landa's request was denied.

87.    Following this denial, Dr. Landa then offered to serve as a resource to the Language Arts instructional team, in order to stay involved in some capacity.

88.     As part of that suggestion, Dr. Landa offered to assist with the EDCI 364 syllabus. Once again, Dr. O'Flahavan refused to respond to Dr. Landa's offers.

89.     Also in October 2016, Dr. O'Flahavan informed Dr. Landa that he would not assign her a Teaching Assistant for one of her Spring 2017 courses.

90.     Upon learning that she would have one less Teaching Assistant to mentor, Dr. Landa requested that Dr. Hultgren reconsider Dr. O'Flahavan's decision to remove her from the new course (as her burden of mentoring of three Teaching Assistant's had previously been given as a reason for her removal from the course). Dr. Hultgren refused to reconsider the decision.

91.     Dr. O'Flahavan's hostility towards and disrespect for Dr. Landa continued throughout the duration of her employment and up until the day she was terminated.

92.     Over the course of several months, from May 2016 to January 2017, Dr. O'Flahavan failed to respond to approximately fifteen emails from Dr. Landa containing inquiries about teaching assignments, work on syllabi, and requesting help to complete her research with the Levinsky College of Education (an opportunity made much more difficult as a result of him unilaterally removing from her from the new course she had developed).

93.     The few times Dr. O'Flahavan responded, he made hostile comments such as "You are wasting my time."

94.     In September 2016 Dr. O'Flahavan informed Dr. Landa that he had blocked her number from his cell phone. Dr. O'Flahavan also represented to Dr. Landa that his office phone was broken beyond repair and suggested that Dr. Landa not attempt to contact him again (despite the fact that they both worked in the same Program and that he had professional control over her career).

95.     Dr. O'Flahavan resisted Dr. Landa's multiple attempts to remedy their relationship (including her request for mediation), and ignored her efforts to find ways to stay involved in her program. He also went out of his way to make her collaboration with her colleagues in Israel fail. For example, as she prepared to collect data for the next phase of her research with the professors from Levinsky, Dr. O'Flahavan informed Dr. Landa that she would not be permitted to attend any of his classes, on-site learning meetings or PDS sessions, as they had originally planned. This made it even *more* difficult for Dr. Landa to complete her research.

96.     Back in May 2016, Dr. Hultgren had assigned Dr. Landa to work on a syllabus for the new EDCI 364 course with Dr. O'Flahavan. Despite the direction from Dr. Hultgren, Dr. O'Flahavan refused to work with her. That responsibility alone would have counted as service to the Department and would have allowed Dr. Landa to contribute to the new literacy program, which was important for her to be promoted to Associate Clinical Professor, but Dr. O'Flahavan would not afford her the opportunity. Dr. O'Flahavan did not even share his decision to exclude Dr. Landa

with her until October, 2016.

97.     On October 19, 2016, Dr. Landa met with Dr. Hultgren regarding Dr. O'Flahavan's decision to exclude her from the development of the syllabus. Despite Dr. Hultgren's earlier assurances that she would be involved in the syllabus' creation, Dr. Hultgren dismissed her complaints and informed her that the instructors would prepare the syllabus without Dr. Landa's input.

98.     Dr. Hultgren provided no explanation for her contrary position, and indicated that, like any instructor, Dr. Landa could review and provide feedback on the syllabus once it had been completed.

99.     Dr. Landa, however, never received a copy of the syllabus to review. When she did not receive a copy of the syllabus to review by January 2017 as she should have, Dr. Landa reached out to Dr. O'Flahavan for a copy. However, he falsely informed her that it had already been completed and distributed to students.

100.     When she finally did receive a copy of the syllabus, Dr. Landa was surprised to see that it was not finished; it was missing information, had vague content, included a temporary course listing number, and referenced Dr. Landa's original work without proper citation.

101.     Further review of the syllabus revealed that much of the class would be taught online – which directly contradicted one of the University's earlier and patently false justifications for removing Dr. Landa from EDCI 364 in the first place

– i.e. that  she lacked experience teaching "on site" in schools. Even if this were true, such experience would not be necessary where the majority of the class was being taught online.

102.    Throughout the Spring 2017 semester, Dr. Landa learned about numerous complaints regarding Dr. O'Flahavan and Dr. Peterson's teaching of EDCI 364. In January, at least four undergraduate students complained to Dean Donna Wiseman and Dr. Hultgren about the way in which EDCI 364 was being taught. On May 8, 2017, another group of undergraduate students wrote to Dr. Hultgren and Associate Provost Dr. Bertot complaining about Dr. O'Flahavan's class.

103.    In addition, students in Dr. O'Flahavan's second section of EDCI 364 reported that he did not teach the course at all, and that it was taught, instead, by a Doctoral student named Jennifer Himmel (also not Jewish).

104.    During the Spring 2017 semester, Dr. Landa also learned that there was no record of the new course, EDCI 364, in the University's course proposal system. The University's internal database listing all approved courses listed only the original Language Arts course, EDCI 342.

105.    On February 1, 2017, Dr. Landa submitted a faculty grievance relating to Dr. O'Flahavan's and Dr. Hultgren's hostility toward her and the concerted actions they had taken to diminish her role within the Undergraduate Elementary

Education Program which all began immediately following her expression of and advocacy for her Jewish beliefs. In the grievance, she raised concerns of discrimination based on religion, noting that she had been held to different standards than non-Jewish faculty and that the abuse had only begun once she had started expressing her Jewish identity more fully, both in her antisemitism work and her request for leave to celebrate the holiday of Passover in Israel.

106.   On May 7, 2017, while her discrimination grievance was pending, Dr. Hultgren circulated a spreadsheet identifying instructors for the Spring 2018 schedule. Yet again, Dr. Landa was excluded from teaching EDCI 364 for the Spring 2018 semester as she had requested. Instead, Dr. O'Flahavan assigned the three sections of the course to himself, Doctoral student Jennifer Himmel, and Margaret Peterson – none of whom had the years of experience in teaching and elementary education instruction that Dr. Landa had. Again, neither Himmel nor Peterson are Jewish.

107.   Dr. Landa immediately questioned why she had not been assigned to the course and why a Doctoral student and faculty member with significantly less experience were being afforded preferential treatment once again.

108.   When pressed for an explanation of this apparently discriminatory act, Dr. O'Flahavan relented and added Dr. Landa's name to the spreadsheet. In doing

so, however, he listed her name with two question marks following the course number.

109.   Dr. Landa was subsequently reprimanded by Dr. Hultgren for addressing the issue with Dr. O'Flahavan and getting involved in the course assignments.

110.   On June 5, 2017, the Faculty Grievance Hearing Board issued its Report and findings, denying Dr. Landa's grievance.

111.   Four days later, on June 9, 2017, the President issued a decision concurring with the Faculty Hearing Board.

112.   On June 8, 2017, three days after the Faculty Grievance Board issued its Report, and while Dr. Landa was in Israel, Dr. Hultgren emailed her with a letter informing her that her contract had not been renewed. The letter provided no justification for the decision and instead simply stated that her last day of employment would be December 19, 2017.

113.   On or about June 28, 2018, Dr. Landa filed a complaint with the Equal Employment Opportunity Commission alleging discrimination based on religion and retaliation.  The Charging Document is Attached as Exhibit A.

114.   The EEOC, following a full investigation of the matter, issued a determination dated April 28, 2020, and held that Defendant was "unable to provide substantial evidence showing that it decided not to renew [Dr. Landa's] contract in

December 2016" as they alleged, and that "there is a strong nexus between the date the Faculty Grievance Hearing board made its finding and the date [Dr. Landa] was informed her contract would not be renewed."

115.   The EEOC concluded that it is "reasonable to believe that [Dr. Landa] was discharged in retaliation for complaining about religious discrimination." The EEOC Determination Letter is attached as Exhibit B.

116.   On or about October 6, 2021, and following unsuccessful attempts by the parties to resolve the matter, the Department of Justice issued Dr. Landa a right to sue letter.

**CAUSES OF ACTION**

**Count I: Hostile Work Environment, Disparate Treatment, and Discrimination Based on Religion in Violation of Title VII**

117.   The allegations in Paragraphs 12 through 116 above are incorporated by reference herein as if fully set out.

118.   Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., makes it unlawful for an employer to discriminate against any individual on account of her religion. Title VII also prohibits disparate treatment in terms and conditions of employment based on an individual's religion.

119.   Pursuant to Title VII, "religion includes all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

120.    Under Title VII, and having sincerely held religious beliefs of which UMD was undisputedly and fully aware, Dr. Landa belongs to a protected class.

121.    When Dr. Landa began expressing her Jewish identity and faith more fully and publicly, she was immediately subjected to disparate treatment and unequal terms and conditions of employment including, but not limited to, adverse employment actions for observing Jewish holidays, removal from teaching classes she had taught for almost a decade, denial of teaching assistance, new limitations on her participation within the Department, hostility, retaliation, and ultimately, termination.

122.    By failing to prevent and by permitting a discriminatory and hostile work environment, in which, as shown above, Dr. Landa's conditions of employment were negatively impacted and her dignity affronted, and which was sufficiently severe and pervasive to unreasonably interfere with her work, Defendant violated the statute.

123.    By treating Dr. Landa differently than her non-Jewish peers, and applying standards to her that Defendant did not apply to anyone else, Defendant engaged in disparate treatment of Dr. Landa and violated the statute.

124.    By firing Dr. Landa for refusing to accept her being treated worse than all of her non-Jewish peers, Defendant engaged in religious discrimination and violated the statute.

125.   The impact of the religious discrimination perpetrated by Defendant was pervasive and substantial.

126.   Defendant's actions, as described above, caused serious financial and emotional harm to Dr. Landa.

127.   The unlawful employment practices of Defendant described and complained of in the paragraphs above were intentional and began only after Dr. Landa began expressing her Judaism in new ways.

128.   As a result of the Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic damages, emotional distress, and other compensable damages.

129.   The unlawful employment practices of Defendant were done with malice and/or reckless indifference to Dr. Landa's protected rights and warrant the imposition of punitive damages.

### Count II: Hostile Environment and Retaliatory Termination in Violation of Title VII

130.   Plaintiff incorporates paragraphs 12 - 116 by reference.

131.   Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., makes it unlawful for an employer to discriminate against any individual because the individual has opposed any practice made an unlawful employment practice under the statute, or because the individual has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under the statute. 42 U.S.C. §2000e-3(a).

132.   An employer may be held liable for a hostile environment based on retaliatory animus.

133.   By failing to prevent and permitting a retaliatory hostile work environment, in which, as shown above, Dr. Landa's concerns were for a long time ignored by the Defendant, even as her employment conditions deteriorated further every time she raised concerns about her discriminatory treatment, Defendant violated the statute.

134.   By firing Dr. Landa for protesting against religious discrimination, Defendant engaged in unlawful retaliation and violated the statute.

135.   The impact of the religious discrimination perpetrated by Defendant was pervasive and substantial.

136.   Defendant's actions, as described above, caused serious financial and emotional harm to Dr. Landa.

137.   The cumulative effect of Defendant's practices complained of in Paragraphs 12 through 116 above has been to deprive Dr. Landa of equal employment opportunities and otherwise adversely affect her status as an employee because of her religious beliefs and her unwillingness to accept discrimination.

138.   The unlawful employment practices of Defendant described and complained of in the paragraphs above were intentional. The unlawful employment practices of Defendant were done with malice and/or reckless indifference to Dr. Landa's protected rights and warrant the imposition of punitive damages.

139.   As a result of the Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic damages, emotional distress, and other compensable damages.

## PRAYER FOR RELIEF

140.   WHEREFORE, Plaintiff Melissa Landa respectfully requests a jury trial and that the Court enter judgment against Defendant, and provide Plaintiff with the following relief:

(a)   An injunction requiring Defendant to rehire Dr. Landa at a position and compensation level commiserate with her experience, accomplishments, publication record, history of academic and research success, and numerous years of service at UMD;

(b)   An injunction enjoining Defendant, their officers, agents, servants, employees, attorneys and all persons in active concert or participation with it from failing to accommodate the sincerely held religious beliefs of its employees.

(c)   A declaratory judgment that Defendant's actions violated Plaintiff's rights under Title VII.

(d)   An order requiring Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees, regardless of religion and/or religious beliefs.

(e) Appropriate backpay with prejudgment interest in an amount to be determined at trial and other affirmative relief necessary to eradicate the effects of unlawful employment practices complained of herein, including but not limited to restatement, or alternatively, awarding front pay.

(f) Compensation for past and future pecuniary losses resulting from the unlawful employment practices complained of herein in an amount to be determined at trial.

(g) Punitive damages in an amount to be determined at trial.

(h) Reasonable attorneys' fees and other litigation costs reasonably incurred in this action pursuant to 42 U.S.C. § 2000e-5(k).

(i) An Order granting to Plaintiff all further relief to which Plaintiff may be entitled.

Respectfully submitted,

/s/ John R. Garza
JOHN R. GARZA
  (MD Bar #No. 01921)
THE GARZA LAW FIRM, P.A.
17 West Jefferson St., Garza Building
Rockville, MD 20850-2409
Telephone: (301) 340-820
Fax: (301) 761-4309
Email: jgarza@garzanet.com

STUART ROTH*
  (D.C. Bar No. 475937)
MARK GOLDFEDER*
  (Bar No. NY 5275649)
ABBIGAIL A. SOUTHERLAND*
  (TN Bar No. 22608)
BENJAMIN P. SISNEY*
  (D.C. Bar. No. 1044721)
THE AMERICAN CENTER
  FOR LAW AND JUSTICE
201 Maryland Avenue, N.E.
Washington, D.C.  20002
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
Email:    sroth@aclj.org
          goldfed@gmail.com
          asoutherland@aclj.org
          bsisney@aclj.org

*Counsel for Plaintiff*    *Motion for Admission Pro Hac Vice Forthcoming*