IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MELISSA LANDA, | * | |
| Plaintiff, | * | |
| v. | * | Case No. TJS-22-0016 |
| UNIVERSITY OF MARYLAND, COLLEGE PARK | * | |
| | * | |
| Defendant. | | |

\* \* \* \* \* \*

## MEMORANDUM OPINION

Pending before the Court is Defendant University of Maryland College Park's ("University") Partial Motion to Dismiss ("Motion") (ECF No. 34).[1] Having considered the submissions of the parties (ECF Nos. 34, 35 & 36), I find that a hearing is unnecessary. *See* Loc. R. 105.6. For the following reasons, the Motion will be denied.

**I.    Background**

Plaintiff Melissa Landa ("Dr. Landa") filed this lawsuit against the University under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). ECF No. 1. In her Amended Complaint (ECF No. 33), Dr. Landa alleges that while working as a professor at the University, she faced religious discrimination, a hostile work environment, and retaliatory termination for engaging in protected activity under Title VII.

In its Motion, the University argues that Dr. Landa's claims of religious-based discrimination and retaliation by the University that allegedly occurred before March 29, 2017, are

---

[1] In accordance with 28 U.S.C. § 636(c), all parties have voluntarily consented to have the undersigned conduct all further proceedings in this case, including trial and entry of final judgment, and conduct all post-judgment proceedings, with direct review by the Fourth Circuit Court of Appeals, if an appeal is filed. ECF No. 21.

time barred. ECF No. 34-1 at 8-9. The University also argues that Dr. Landa's hostile work environment claims should be dismissed under Fed. R. Civ. P. 12(b)(6). *Id.* at 9-14. The Motion is fully briefed and ripe for decision.

## II.     Legal Standard

Rule 12(b)(6) permits a court to dismiss a complaint if it fails to "state a claim upon which relief can be granted." "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint, [and not to] resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (internal quotation marks omitted). A complaint must consist of "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). When considering a motion to dismiss, a court must accept as true the well-pled allegations of the complaint and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). While a court must take the facts in the light most favorable to the plaintiff, it "need not accept the legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint generally "does not need detailed factual

allegations." *Id.* So long as the factual allegations are "enough to raise a right to relief above the speculative level," the complaint will be deemed sufficient. *Id.* A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and that a recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

**III. Discussion**

**A. Factual Allegations of the Amended Complaint**

For the sake of the Motion, the Court accepts the factual allegations of Dr. Landa's Amended Complaint as true, and construes those facts and reasonable inferences derived from them in the light most favorable to her.

Dr. Landa "is Jewish, and celebrates traditional Jewish Holidays." ECF No. 33 ¶ 7. She identifies as "a religious Zionist, and her Zionism is a core and fundamental part of her Jewish religious identity." *Id.* Dr. Landa has made public statements that "her Zionism is part and parcel of her Judaism." *Id.* ¶ 25. Dr. Landa holds a Ph.D. in English Language Education. *Id.* ¶ 13. She began working for the University in September 2005 as a Graduate Assistant in the Department of Curriculum and Instruction. *Id.* ¶ 12. In 2007, she accepted a full-time faculty position with the same department (the department was later renamed the Department of Teaching and Learning, Policy and Leadership). *Id.* ¶ 14. At all relevant times, Dr. Landa was the only Jewish member of her department's Undergraduate Elementary Education Program, which operated under the direction of Dr. John O'Flahavan. *Id.* ¶ 18.

Dr. Landa mainly worked as an Instructor of Record for an undergraduate course, Language Art Methods, EDCA 342, "a course which prepared future teachers for language and literacy instruction." *Id.* ¶¶ 15, 19. As an instructor, Dr. Landa incorporated content into the course "that addressed cultural competence," which had not been part of the course. *Id.* ¶ 19. Over time,

Dr. Landa received several awards and commendations for her work. *Id.* ¶ 16. She also enjoyed a "close and collegial working relationship" with Dr. O'Flahavan. *Id.* ¶ 20.

In late 2015, Dr. Landa began making more public efforts to raise awareness of antisemitism. *Id.* ¶ 25. In December 2015, Dr. Landa started organizing a group of Oberlin College alumni "to address antisemitism on college campuses." *Id.* ¶ 21. In January 2016, Dr. Landa became an affiliate professor at the University of Haifa in "a gesture of solidarity with Israeli scholars" who Dr. Landa believes are "being ostracized by the academic boycotts against Israel." *Id.* ¶ 23. The same month, Dr. Landa informed her department's chair, Dr. Francine Hultgren, "that she was going to be in the news discussing her work opposing antisemitism," including the Boycott, Divestment, and Sanctions ("BDS") movement. *Id.* ¶ 24. And in March 2016, Dr. Landa joined the Academic Engagement Network ("AEN"), an organization of American college and university faculty who oppose the BDS movement. *Id.* ¶ 28.

According to Dr. Landa, her colleagues at the University did not support her public efforts opposing antisemitism and the BDS movement. *Id.* ¶ 25. Dr. O'Flahavan criticized Dr. Landa's efforts and dismissed Dr. Landa's stated concerns about her "non-Jewish friends being unwilling to condemn antisemitism." *Id.* ¶ 21. He suggested she "distance herself from the Oberlin group." *Id.* ¶ 27. In February and March 2016, Dr. O'Flahavan canceled meetings that had been scheduled with Dr. Landa to prepare for a joint presentation scheduled for April 2016. *Id.* ¶ 28.

In March 2016, Dr. Landa "submitted a request for leave for two weeks to travel to Israel for the Jewish holiday of Passover." *Id.* ¶ 30. She provided information to Dr. Hultgren about how her courses would be covered during her trip, and her request was authorized. *Id.* In April 2016, after Dr. Landa informed Dr. O'Flahavan about her involvement with AEN and her plan to attend the annual conference, Dr. O'Flahavan told her that he would not help present a paper they had

co-authored at an upcoming conference, and that he would not share the podium with her at the conference. *Id.* ¶ 33. As a result, Dr. Landa had to make the presentation herself. *Id.* ¶ 36.

Later in April 2016, Dr. Landa traveled to Israel. *Id.* ¶ 37. On April 22, 2016, Dr. Landa received an "unexpected and harsh email from Dr. Hultgren" reprimanding her for taking leave and "indicating disapproval of her trip." *Id.* ¶ 38. The email suggested that Dr. Landa's "travel to Israel for Passover [was] possibly grounds for losing her job." *Id.* ¶ 39. Dr. Landa's Passover was ruined. *Id.* ¶ 40. In Dr. Landa's mind, Dr. Hultgren's treatment of her travel was unusually harsh and negative, especially when compared to how other colleagues' vacation plans had been treated. *Id.* ¶¶ 41-43. At Dr. Hultgren's urging, Dr. Landa cut her trip short and returned to the United States. *Id.* ¶ 44. Upon her return, Dr. Hultgren told Dr. Landa that she "should never have granted [Dr. Landa] permission for the trip." *Id.* ¶ 45. Dr. Landa promptly filed a religious discrimination report with the College Diversity Officer. *Id.* ¶ 46.

On April 29, 2016, Dr. Landa told Dr. O'Flahavan that she "had been awarded a grant from AEN to create a partnership with the Levinsky College of Education in Israel and that two scholars from Levinsky would join her research team." *Id.* ¶ 47. Dr. Landa made "Dr. O'Flahavan aware of the grant award and also discussed her desire to involve students at [the University] during the next iteration of the [EDCI 364 course] that she had already been assigned to teach in Spring 2017." *Id.* ¶ 48. On or about May 5, 2016, "with no advance warning, Dr. O'Flahavan informed Dr. Landa that she would not be permitted to teach the new version of the literary course she had taught from more than ten years and would not be permitted to teach a new version of the [EDCI 364] course in the Spring of 2017." *Id.* ¶ 49. This decision "made it impossible for Dr. Landa to conduct the necessary research [required] under the terms of the grant, putting her entire collaboration with Israel at risk." *Id*.

Since 2013, Dr. Landa and Dr. O'Flahavan had been developing a new course named "Culturally Responsive Language and Literacy Instruction in Elementary Classroom" (EDCI 364) to replace an older course (EDCI 362) that Dr. Landa had been teaching for more than a decade. *Id.* ¶¶ 50-51. The new course was to include "Dr. Landa's particular areas of expertise." *Id.* On May 20, 2016, Dr. O'Flahavan notified Dr. Hultgren that he intended to "remove Dr. Landa from teaching the course." *Id.* ¶ 52. He said that while his original plan was for Dr. Landa to teach EDCI 364 in the Spring of 2017, he had developed "doubts about having [her]" teach it. *Id.* The person that Dr. O'Flahavan selected to teach the course in Dr. Landa's place had only three years of experience (compared to Dr. Landa's 10 years of experience) and "had minimal experience in elementary education and no expertise in culturally responsive teacher courses." *Id.* ¶ 53. Dr. O'Flahavan had never exercised such control over Dr. Landa's choices and options in course selection. *Id.* ¶ 56. In light of this decision, Dr. Landa believed her partnership with the Levinsky College was jeopardized and that her career in the Undergraduate Elementary Education Program was in danger. *Id.* ¶¶ 57-58.

In June 2016, Dr. Landa emailed Dr. O'Flahavan to "express her concerns regarding the lack of a course to teach." *Id.* ¶ 59. She "made numerous attempts to engage Dr. O'Flahavan and Dr. Hultgren" regarding her removal as instructor of the course that she had worked to develop. *Id.* ¶ 60. Ultimately, three sections of the new course (EDCI 364) were made available in the Spring 2017 semester, but Dr. Landa was not permitted to teach any of the sections. *Id.* ¶¶ 62-63. Dr. O'Flahavan and Dr. Hultgren provided "inconsistent explanations" for not allowing Dr. Landa to teach the course. *Id.* ¶¶ 65-73. In Dr. Landa's view, these explanations did not hold up under scrutiny. *Id.*

6

In early August 2016, Dr. Landa lodged additional complaints about religious discrimination: to the Dean's Office by telephone and in writing to Donna Wiseman, Dean of the College of Education. *Id.* ¶¶ 75-76. Dr. Landa also advised Dr. Jennifer Rice, Associate Dean for the College, that she "intended to file a Faculty Grievance." *Id.* ¶ 77. The University took no action. *Id.* ¶ 78. On October 6, 2016, Dr. Landa reported a claim of religious discrimination to the University Ombuds Officer. *Id.* ¶ 81. And on October 13, 2016, Dr. Landa submitted a grievance based on religious discrimination to the Department's Diversity Officer. *Id.*

Dr. Landa sought other teaching options and requested to teach other courses. *Id.* ¶¶ 83, 85, 87. Dr. O'Flahavan ignored or denied each of Dr. Landa's requests. *Id.* When Dr. Landa "made other suggestions" for courses to teach, Dr. O'Flahavan chastised her and said he was "at the end of [his] rope on this." *Id.* ¶ 84. Dr. O'Flahavan assigned the courses that Dr. Landa requested to teach to others, including non-Jewish doctoral students. *Id.* ¶ 85.

Dr. Landa's Amended Complaint sets forth a litany of ways that she believes Dr. O'Flahavan acted with hostility and disrespect towards her: he refused to assign her a teaching assistant for her Spring 2017 courses; he did not respond to about 15 emails between May 2016 and January 2017; he made hostile comments to her; he yelled and berated her at a meeting; he blocked her number from his cell phone and told Dr. Landa not to contact him on the office phone; he refused to meet with her and the University ombudsperson; he refused to meet with her and Associate Dean Jennifer Rice; he barred her from attending any of his classes; and, he generally refused to work with her. *Id.* ¶¶ 87-100. When Dr. Landa raised concerns with Dr. Hultgren, they were dismissed without explanation. *Id.* ¶¶ 101-102.

On December 9, 2016, at a meeting of the Teacher and Leader Research and Education Committee, Dr. O'Flahavan expressed an opinion (related to Dr. Landa's efforts to "expose" the

7

"virulent antisemitic views" of a professor at another university) that "targeted and humiliated Dr. Landa and further ostracized her from her colleagues." *Id.* ¶¶ 107-108. On February 1, 2017, Dr. Landa submitted a faculty grievance directed at Dr. O'Flahavan and Dr. Hultgren's hostility towards her. *Id.* ¶ 112. She raised concerns of religious discrimination. *Id.* ¶ 113. Immediately thereafter, "several faculty members ceased speaking with her" and one "accused her of spreading rumors." *Id.* ¶ 114.

On May 7, 2017, Dr. Hultgren circulated a spreadsheet identifying instructors for the Spring 2018 schedule. *Id.* ¶ 118. Dr. Landa was excluded from teaching the EDCA 364 course, which was instead assigned to Dr. O'Flahavan, and two other non-Jewish instructors. *Id.* Dr. Landa objected to her non-assignment and was "subsequently reprimanded by Dr. Hultgren." *Id.* ¶ 121.

On June 5, 2017, the Faculty Grievance Hearing Board issued its report and findings. *Id.* ¶ 122. It denied Dr. Landa's grievance. *Id.* The report expressed hope, however, that Dr. Landa might find a professional path "that harmonizes her teaching and scholarly interests with the needs of the Department." *Id.* ¶ 123. Three days later, Dr. Hultgren notified Dr. Landa that her contract had not been renewed and that her last day of employment would be December 19, 2017. The letter did not provide any explanation. *Id.*

"Between June 2017 and December 2017," Dr. Landa filed a complaint with the University's Office of Civil Rights. *Id.* ¶ 127. Dr. Landa asserts that the Office of Civil Rights never "fairly or fully investigated" her complaint. *Id.* ¶ 128. When the Office of Civil Rights issued a report of its findings, it "contained contradictions, misinformation, and disparaging remarks about Dr. Landa." *Id.* ¶ 129. And on December 18, 2017, Dr. Jennifer Rice "publicly humiliated Dr. Landa, essentially calling her a liar." *Id.* ¶ 130.

Dr. Landa filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 23, 2018. *Id.* ¶ 131. The same day, she cross-filed the complaint with the Maryland Commission on Civil Rights. *Id.* ¶ 135. The EEOC issued a determination dated April 28, 2020, that ultimately held that it was "reasonable to believe that [Dr. Landa] was discharged in retaliation for complaining about religious discrimination." *Id.* ¶ 144. A right to sue letter was issued on October 6, 2021. *Id.* ¶ 145. Dr. Landa filed this lawsuit on January 4, 2022. ECF No. 1.

### B.  Timeliness of Discrete Acts Under Title VII

The University argues that any claims of discrete discriminatory or retaliatory conduct before March 29, 2017, must be dismissed as untimely. ECF No. 34-1 at 8-9. Before filing a lawsuit in federal court, Title VII requires a plaintiff to "exhaust [their] administrative remedies by filing a charge with the EEOC." *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 592 (4th Cir. 2012); *see also Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). Title VII establishes two possible limitation periods for filing a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). *See* 42 U.S.C.A. § 2000e–5(e)(1). "The basic limitations period is 180 days after the alleged unlawful employment practice," but "the limitations period is extended to 300 days when state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency." *Jones*, 551 F.3d at 300 (quoting *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir. 1998)). In Maryland, a deferral state, a claim of discrimination under Title VII must be filed with the EEOC within 300 days of the alleged discriminatory action. *EEOC v. R&R Ventures*, 244 F.3d 334, 338 n.1 (4th Cir. 2001).

If the EEOC dismisses the charge, or if the plaintiff requests a right to sue notice, a plaintiff has 90 days from receiving his or her notice of dismissal and right to sue letter to file in action in

9

court. 42 U.S.C. § 2000e-5(f)(1). "Timeliness requirements for an action alleging employment discrimination are to be strictly enforced." *Tangires v. Johns Hopkins Hosp.*, 79 F. Supp. 2d 587, 597 (D. Md.), *aff'd*, 230 F.3d 1354 (4th Cir. 2000) (citing *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984)).

A plaintiff's EEOC charge "defines the scope of the plaintiff's right to institute a civil suit." *Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent . . . lawsuit." *Jones*, 551 F.3d at 300. If an "EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex," the claim will generally be barred for the plaintiff's failure to exhaust administrative remedies. *Id.*

Dr. Landa alleges that she filed her charge with the EEOC on January 23, 2018. ECF No. 33 ¶ 131. Accordingly, only discrete acts of discrimination or retaliation that occurred before March 29, 2017 (300 days before January 23, 2018) are actionable. The University argues that any claims arising from acts before March 29, 2017, must be dismissed.

Dr. Landa agrees, with two qualifications. ECF No. 35 at 2-4. First, she notes that while discrete acts of discrimination that occurred before March 29, 2017, may be time-barred, those acts of discrimination may still serve as "background evidence" to support her timely claims. *Id.* at 3. Second, Dr. Landa notes that her hostile work environment claims, which are necessarily "composed of a series of separate acts that collectively constitute one unlawful employment practice," *id.* at 3 (internal quotations marks omitted), are anchored by acts within the 300-day period. She states that so long as part of her hostile work environment claims are timely, the

University may be liable for all acts that are part of the claims. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-19 (2002). Dr. Landa is correct on these points. Even if certain discrete acts asserted in her Amended Complaint are time-barred, these acts might serve as evidence to support her timely-asserted claims. And because at least part of her hostile work environment claims are timely, any acts that are part of that claim—even if they precede the date of her EEOC charge by more than 300 days—may properly be considered as part of the claims.

Accordingly, if Dr. Landa has asserted any claims of discrimination or retaliation that are based on acts that occurred before March 29, 2017, and that are not part of her hostile work environment claims, those claims will be dismissed with prejudice. Given Dr. Landa's response to the Motion, it is not clear that she intended to assert any such claims in the first place.

### C. Hostile Work Environment

Dr. Landa asserts two hostile work environment claims against the University. She alleges that she was subjected to a hostile work environment because of her religion (Count I) and because she complained about religious discrimination (Count II). ECF No. 33 ¶¶ 151, 164.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victims' employment and create an abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). To establish a prima facie case of religious discrimination based on a hostile work environment, a plaintiff must prove (1) unwelcome conduct; (2) based on the plaintiff's religion; (3) sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work

environment; and (4) that is imputable to the employer. *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011). "Conduct is 'unwelcome' when it continues after the employee sufficiently communicates that it is unwelcome." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 117-18 (4th Cir. 2021) (quoting *Albero v. City of Salisbury*, 422 F. Supp. 2d 549, 557-58 (D. Md. 2006)). "Establishing the third element requires that the plaintiff show that the work environment was not only subjectively hostile, but also objectively so." *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011). "To determine whether an environment is hostile, the Court must look at all the circumstances, which 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Roberts*, 998 F.3d at 117-18 (quoting *Harris*, 510 U.S. at 23); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276 (4th Cir. 2015).

Title VII also prohibits an employer from retaliating against an employee for complaining about prior discrimination. *Foster v. Univ. of Md.–Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing 42 U.S.C. §§ 200e-2(a)(1), 2000e-3(a)). A plaintiff may prove a Title VII retaliation claim either through direct evidence of retaliatory animus or through the *McDonnell Douglas* burden-shifting framework. *Roberts*, 998 F.3d at 122 (citing *Foster*, 787 F.3d at 249; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

To prevail under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case by showing that she "engaged in protected activity," that her employer "took an adverse action against her," and that "a causal relationship existed between the protected activity and the adverse employment activity." *Roberts*, 998 F.3d at 122 (quoting *Foster*, 787 F.3d at 250 (internal citation omitted)). After a prima facie case is made, the burden shifts to the employer to show that

it took the adverse action for a legitimate, non-retaliatory reason. *Id.* If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by showing the employer's purported non-retaliatory reasons were pretext for discrimination. *Id.*

The University does not contest that Dr. Landa may have experienced unwelcome behavior in a professional environment. But it argues that "Dr. Landa's allegations are not sufficiently severe or pervasive to meet the 'high bar' required to assert a plausible hostile work environment claim." ECF No. 34-1 at 11. Dr. Landa counters that her "experience[] was severe and pervasive to her personally." ECF No. 35. Also, given the state of the proceedings "[n]ow is not the time for Dr. Landa to show or establish anything – but she will do so when the time comes." ECF No. 35 at 7 (footnote omitted).

In support of its argument, the University argues that, at most, Dr. Landa's coworkers and supervisors were rude and callous, which is not enough to state a hostile work environment claim. The University cites several cases throughout this district and the Fourth Circuit in which courts have dismissed plaintiffs' hostile work environment claims for not pleading sufficiently severe or pervasive misconduct. *Id.* at 11-13. The University also argues that even if the alleged acts are severe or pervasive enough, there is no allegation that "any University employee made negative, incendiary, or derogatory comments about Dr. Landa's religion." *Id.* at 13. Likewise, the University contends that there is no allegation that Dr. O'Flahavan or Dr. Hultgren were aware of her internal complaints of discrimination, which would render any retaliatory action on their part a legal impossibility. *Id.* at 13-14.

The Court recognizes that this is a close call. The acts that Dr. Landa alleges appear to be less severe and pervasive than the facts in other cases in which courts have permitted hostile work

environment claims to proceed. But the Court will deny the University's Motion as to the hostile work environment claims for two reasons.

First, Dr. Landa has plausibly alleged that her treatment by her coworkers and supervisors unreasonably interfered with her work performance. For instance, throughout the Amended Complaint, she alleges that she was denied requested teaching roles without explanation. While it is unclear what other professional duties Dr. Landa performed while employed by the University, teaching was an important aspect of her work. Dr. Landa alleges that around the same time she became more involved with efforts to oppose antisemitism, she was deprived of teaching responsibilities. When she complained about what she perceived as religious discrimination, she was denied more teaching opportunities and ultimately terminated. And between early 2016 and June 2017 (when Dr. Landa was informed that she would be terminated), she alleges that other faculty members made remarks that demeaned her religious Zionism, her opposition to antisemitism, and her opposition to the BDS movement. Taken together, at this stage of the case, these circumstances plausibly suggest that Dr. Landa was subjected to a hostile work environment because of religious discrimination or in retaliation for engaging in protected activity.

Second, the Motion will be denied for prudential reasons. Even if the Court dismissed Dr. Landa's hostile work environment claims, all the facts alleged in support of these claims would still be relevant to the remaining claims under the broad scope of discovery of Rule 26. Thus, dismissing the claims now will do little to spare the parties any expense or time as this case proceeds. Depending on how the parties conduct this litigation, the Court may be in a better position to determine whether any claims should proceed to a jury in the context of a motion for summary judgment filed after the record is developed during discovery. At this stage, Dr. Landa's

hostile work environment case may not be strong, but it is plausible. Accordingly, the Motion will be denied as to the hostile work environment claims.

## IV.     Conclusion

For these reasons, the University's Partial Motion to Dismiss (ECF No. 34) is **GRANTED IN PART** and **DENIED IN PART**. If Dr. Landa has asserted any claims of discrimination or retaliation that are based solely on acts that occurred before March 29, 2017, and that are not part of her hostile work environment claims, those claims will be dismissed with prejudice. Otherwise, the Motion is denied.

An accompanying Order follows.

<u>July 22, 2022</u>            <u>      /s/               </u>
Date                  Timothy J. Sullivan
                   United States Magistrate Judge